

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Susan Lindauer | : | |
| 232 Manor Circle | : | |
| Takoma Park, Maryland 20912 | : | COMPLAINT |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | Civil No.: PWG 19 CV0039 |
| Ocwen Loan Servicing, LLC | : | |
| 1661 Worthington Road, Suite 100 | : | |
| West Palm Beach, FL 33409 | : | **TRIAL BY JURY DEMANDED** |
| | : | |
| Defendant. | : | |

## COMPLAINT

**COMES NOW,** Susan Lindauer, Plaintiff in the above-captioned matter, and files this complaint demanding judgment against Ocwen Loan Servicing, LLC, (hereinafter, "Ocwen") and alleges the following in support thereof:

1.    After a nationwide investigation by State financial regulators, state attorneys general, and the Consumer Financial Protection Bureau (hereinafter, "CFPB" a federal agency) substantial evidence was uncovered that proved Ocwen violated multiple state laws and the Dodd-Frank Act, in the [mal]servicing of homeowner's mortgage loans and the unlawful pursuit of foreclosures.

2.  As a result, Ocwen voluntarily entered into a "Consent Judgment" on December 16, 2013 which was signed on behalf of Ocwen Financial Corporation and Ocwen Loan Servicing, LLC by Timothy M. Hayes, Executive Vice-President and General Counsel. This document was filed with the court on February 26, 2014. See Exhibit "A" attached.

3.    The fraudulent conduct by Ocwen alleged in this complaint occurred while the consent judgment was in force, beginning on or around February 26, 2014 and continues to this day.

4.    In February 2001, Ms. Lindauer ("the Plaintiff") purchased certain real property commonly known as 232 Manor Circle, Takoma

Park, Maryland 20912 with a $37,000 cash down payment and a "mortgage loan" in the amount of $197,000.

5.     On or about February 20, 2007, Ms. Lindauer refinanced the "mortgage loan" on the Subject Property[1] located at 232 Manor Circle, Takoma Park, Maryland 20912, through American Heritage Lending Corporation (hereinafter, "AHLC").

6.     At this time, she executed an adjustable rate balloon note (promissory note) in favor of AHLC, making a non-negotiable bond for the payment of thirty years of monthly installments. See Exhibit "B", attached.

7.     The note was secured with a deed of trust impossibly naming Mortgage Electronic Registration Systems ("MERS") as "beneficiary", acting solely as an indenture nominee for AHLC and any successors and assigns', and who therefore was not any sort of "beneficiary". See Exhibit "C", attached.

---

[1] Hereinafter, "Subject Property" means 232 Manor Circle, Takoma Park, Maryland 20912

8.     Ms. Lindauer immediately began to make each monthly payment due on the "mortgage loan" to Chase Home Finance (hereinafter, "Chase"), which may have acquired the servicing rights to the "mortgage loan" from AHLC, or at least it was represented this way to Ms. Lindauer, who made those payments accordingly.

9.     On or about April 7, 2012, Ocwen Loan Servicing, LLC ("Ocwen") may have acquired from Chase the servicing rights to the "mortgage loan" from AHLC, and at any rate they began to collect payments and sent later accountings by mail under that pretension shortly thereafter.

10.    Soon after Ms. Lindauer made her April 1st payment to Chase, Ms. Lindauer received a phone solicitation from an Ocwen customer service representative who offered her (as a new customer) a one-time reduced payment that could cover any missing past payments (of which there were none) or count as the next month's payment.

11.    Since Ms. Lindauer had already made her April payment, she was adamant that Ocwen's offer of a one-time reduced payment be

credited forward to May, and the Ocwen representative assured her that would be the case, so on April 13th, she submitted a one-time reduced payment to Ocwen.

12.    Ms. Lindauer's first complete payment to Ocwen was May 1, 2012, and she was assured by an Ocwen customer service representative that the May 1 payment would apply forward to June once Ocwen sorted out all the new accounts it had recently acquired.

13.    Ocwen then credited Ms. Lindauer's May 1, 2012 payment to April 30, despite her bank statement proving that the payment was made on May 1 and Ocwen refused to correct its error.

14.    Upon calling Ocwen prior to her July payment, Ms. Lindauer was informed by the Ocwen representative that the account owed money back to February; in other words, Ocwen said it had no record of Ms. Lindauer's February 6, March 6 and April 2 payments to CHASE Bank, the prior "mortgage loan" servicer.

15.    From this point forward, Ocwen would credit Ms. Lindauer's on-time payments to prior months for which she had already paid, this

despite her sending Ocwen bank statements proving she had made all her payments and was never in arrears.

16.    Ms. Lindauer submitted to Ocwen her <u>bank statements</u> and two <u>letters of proof</u> from Bank of America ("BOA") where she maintained a checking account, that the three disputed payment checks had been cashed and cleared her account, but Ocwen still refused to acknowledge Ms. Lindauer's three on-time payments from those previous months. See Exhibit "D", bank letter proof.

17.    After more than three years of Ms. Lindauer trying to resolve this matter, Ocwen initiated foreclosure proceedings against the Subject Property on or about November 30, 2015 by filing a Notice of Foreclosure Action in the name of Laura H.G. O'Sullivan, et al, Substitute Trustees, naming the plaintiff above ("Susan Lindauer") as principal Respondent or Defendant in the State court action. See Exhibit "E" attached for the notice of foreclosure.

18.    All substitute trustees were attorneys employed by the foreclosure mill law firm of McCabe, Weisberg & Conway, LLC, 312

Marshall Avenue, Ste. 800, Laurel, Maryland 20707, standing instead of 'U.S. Bank, N.A. as Trustee for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates, Series 2007-2".

19.     This sudden appearance of anybody representing "U.S. Bank, N.A. as Trustee for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates, Series 2007-2" was absolutely astounding because this Plaintiff had never once heard of, nor dealt with such an entity.

20.     "U.S. Bank", by its own publication "Role of the Corporate Trustee" (attached as Exhibit "F") completely denies the premise altogether. Specifically, it is stated therein that the "Certificate Trustee" plays <u>no role</u> in foreclosures, loan modifications, holding notes, maintaining property, etc., and in the instant matter, U.S. Bank, N.A. displayed none of the attributes of a real creditor or real interested party.

21.     This style, a "Loan Certificate Trustee" relates to the well-known formula for a mortgage securitization trust, which is not a "trust" in the

ordinary sense, but a Wall Street traded investment vehicle that benefits from a UCC-1 security agreement held by its "Certificate Series Trustee", against whomever it is that will actually hold the "mortgage loan enforcement rights".

22.     This debtor (the servicer) to the 5th party creditor ("the Certificate Trustee") collects the related monthly payments, and distributes accordingly, becoming the investment returns for the "securitization trust", which then gets traded in stock shares on the various financial exchanges.

23.     Neither a "Mortgage Backed Certificate Series Trustee", nor its attending Certificate Series Trust, holds any loans, notes, bonds, mortgages or has any legal right to anything, except under a UCC-1 Security Agreement, holding the "Mortgage Servicer" (like Ocwen Loan Servicing, LLC) as debtor in the arrangement. See "The Role of the Trustee in Asset Backed Securities" published by the "American Bankers Association Committee" at Exhibit "G".

24.     All the "loan paperwork", accounts, supporting statements, "business records", agency and agents, signatures and literally every element of the State foreclosure action against the subject property consists of material and activity fraudulently generated by Ocwen Loan Servicing, LLC.

25.     Neither its "substitute trustees", nor 'U.S. Bank, N.A. as Trustee for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates Series 2007-2" ever added to, participated in, signed anything, or otherwise appeared except in this "borrowed" name.

26.     Meanwhile, all paperwork included in the foreclosure action was produced, verified, accounted, signed, and executed solely by employees of "Ocwen Loan Servicing, LLC", and the law-firm of the "substitute trustees".

27.     The State Court granted foreclosure on March 3, 2017, notwithstanding the impossible set of circumstances, lack of

admissible evidence, and the plethora of self-serving robo-signed[2] documents prepared by Ocwen, and without a judicial hearing or judicial order in support of the action.

28.    The facts of the foreclosure have never been decided on the merits and this is the first chance Plaintiff Susan Lindauer has found to actually address the real issues in court.

29.    Scheduling of the Sheriff's Sale is imminent and the irreparable harm of Ms. Lindauer losing her property is real. Ocwen Loan Servicing, LLC has perpetrated a tremendous and deliberate fraud on the homeowner Ms. Lindauer, the courts, and the State of Maryland.

30.    By deliberately refusing to account for proven payments, and willfully engineering a situation that makes foreclosure inevitable, Ocwen again proved its *modus operandi* as under the "Consent Judgment", and this is a serious violation of that stipulation.

---

[2] "Robo-Signing": the practice of 'dummying up paperwork and forging mortgage documents by people signing documents and swearing to their accuracy without verifying any of the information.

31.     Because this is a longstanding pattern with "Ocwen Loan Servicing LLC", they were subject to a State of Maryland "Consent Judgment" issuing out of the same practices and policy circumstances and environment, and it is a more than a reasonable inference that Ms. Lindauer here has suffered all the same injuries as the other victims in the well-known "Ocwen Foreclosure Scam."

## FIRST ACCOUNT FOR DAMAGES

32.     Plaintiff incorporates all the previous paragraphs as if set forth fully herein and at length.

33.     Ocwen engaged in a pattern and practice of defrauding the Plaintiff, during the time it was servicing Plaintiff Susan Lindauer's mortgage loan, where Ocwen willfully failed to credit the payments proven to have been made.

34.     Ocwen engaged in a pattern and practice of defrauding the Plaintiff, during the time it was servicing Plaintiff Susan Lindauer's mortgage loan, when it "remote-foreclosed" on the Subject Property

without cause or standing, using a false name in an impossible capacity and to conceal its criminal wrongdoing.

35.     Defendant Ocwen Loan Servicing, LLC collectively and its agents or employees in their individual capacities, knew or should have known this was false, bringing the matter in obvious bad faith for the real purpose of stealing Ms.Lindauer's house, again deceiving the courts, the public and the homeowner by using a false name, not a party to any action or "mortgage loan".

36.     Ocwen covered its wrongdoing by supplying the court with fraudulent "records" and other documents and information, besides agency and signatures, on behalf of "U.S. Bank as Trustee", without any authority from "U.S. Bank" or an executive commission.

37.     It is denied that "U.S. Bank" authorized or participated in this matter at all, and Ocwen is charged with perjury and fraud in this indictment. U.S. Bank's own publication "Role of the Corporate Trustee" (see again, Exhibit "F") completely denies the premise altogether.

38.     Based upon its fraudulent demand for non-payment, Ocwen filed a notice of foreclosure action against the Lindauer property, and to facilitate its fraudulent foreclosure action against these "Subject Premises", Ocwen ordered and supervised the fabrication of the fraudulent robo-signed documents used by the foreclosing Substitute Trustees in the foreclosure action against Plaintiff.

39.     Ms. Lindauer had no choice but to rely on the demonstrably fraudulent documents and defend her property. Had Ms. Lindauer ignored these fraudulent documents, she would have lost her home much sooner, which is now going to be scheduled for a sheriff's sale.

40.     Several Ocwen employees were employed to perpetrate the fraud against Ms. Lindauer, including but not limited to Lori Ann Dasch, Andrew Smith, Mei-Ling Mitchell, and notary Brandi Berns, who signed under oath documents they knew or should have known were fraudulent.

41.     Pursuant to the legal doctrine *nemo dat quod non habet*, or in plain English, you can't give what you don't have, the Substitute Trustees

could not have any authority to foreclose on Ms. Lindauer's property because U.S. Bank, N.A. as Certificate Series Trustee had no authority to foreclose, and therefore no authority to assign.

42.     U.S. Bank, N.A. as Certificate Series Trustee did not and could not hold the promissory note, or the right to enforce payment, and it could not have by any other means either.

43.     This is clearly demonstrated on page 2 of a four-page document (see again, Exhibit "F") published by U.S. Bank entitled "Role of the Corporate Trustee" under the heading, "Who Initiates and Manages a Foreclosure?" whereby it states,

> *"The trustee does not have an economic or beneficial interest in the loans and has no authority to manage or otherwise take action on the loans which is reserved for the servicer."*

44.     Further, in that same paragraph,

> *"As noted, the trustee does not play a role in initiating or managing a foreclosure process and consequently has little, if any, information relating to mortgage loan activities including a foreclosure."*

45.     Ocwen was the purported servicer for Ms. Lindauer's alleged loan, especially insofar as the state court "mortgage foreclosure" was prosecuted and obtained.

46.     Further, in its conduct and evasions, Ocwen was in direct violation of a Consent Judgment in the United States District Court for the District of Columbia, 13-cv-2025. (See again, Exhibit "A")

47.     Ocwen voluntarily entered into the "Consent Judgment" on December 16, 2013 and it was signed on behalf of Ocwen Loan Servicing, LLC by Timothy M. Hayes, Executive Vice-President and General Counsel.

48.     This was not the only settlement agreement Ocwen entered into; it also signed a Consent Order with the New York State Department of Financial Services, entered into by Ocwen dated December 19, 2014 and again signed on behalf of Ocwen Loan Servicing by Timothy M. Hayes, Executive Vice-President. (see Exhibit "H" attached)

49.     The federal complaint that forced Ocwen to agree to the "consent judgment" with the Consumer Financial Protection Bureau (CFPB) and

its forty-nine partner states and the District of Columbia, charged that Ocwen pushed borrowers into foreclosure by its own servicing errors, exactly like those it perpetrated upon Ms. Lindauer.

50.     Further, the CFPB and its partner states proved that Ocwen engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process.

51.     As demonstrated by the complaint filed in the federal district court in the District of Columbia, Ocwen's violations of consumer financial protections put thousands of people across the country at risk of losing their homes, including Ms. Lindauer. (see again, Exhibit "A", "Consent Judgment")

52.     Specifically, the complaint charged that Ocwen took advantage of homeowners with servicing shortcuts and unauthorized fees in several ways, including: **failure to timely and accurately apply payments made by borrowers** [as in the case of Ms. Lindauer].

53.     **Failing to maintain accurate account statements** [as in the case of Ms. Lindauer]; charging borrowers unauthorized fees for default-

related services [as in the case of Ms. Lindauer]; and providing **false or misleading information** in response to consumer complaints [as in the case of Ms. Lindauer].

54.     The complaint also charged that Ocwen was engaged in illegal foreclosure practices; one of the most important jobs of a mortgage servicer being management of the foreclosure process, but Ocwen mishandled foreclosures and provided consumers with false information designed to mislead and evade proper accounting.

55.     Noting that the "Role of the Corporate Trustee" (see again, Exhibit "F") establishes these relationships, and the distributed workload, any foreclosure against Ms. Lindauer's property had to come from Ocwen and Ocwen only.

56.     Ocwen is maliciously motivated by the lucrative prospect of gaining the liquidation of the property and the huge industry attending foreclosure and litigation matters, besides government refunds.

57.     Specifically, Ocwen was proven to have:

a. Provided false and misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and

b. Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.

58.    As part of its agreement, Ocwen agreed to stop robo-signing official documents; that it would ensure the facts asserted in its documents about borrowers' loans used in foreclosure and bankruptcy proceedings were accurate and supported by reliable evidence, and its Affidavits and sworn statements would be averred on personal knowledge only.

59.    Since 2013, as amply shown by the facts of this instant case, Ocwen has failed to abide by the consent judgment it voluntarily signed in 2013, and we are now in 2019. Instead, Ocwen again

breached the consent judgment, and the plaintiff has a direct and pecuniary interest in the guarantee.

60.    As a direct and proximate result of the willful, malicious, and wanton conduct of Ocwen as set forth above, and faced with the unlawful theft of her home, Ms. Lindauer suffered and continues to suffer from debilitating stress, anxiety, loss of appetite, mental anguish, physical infirmities and constant insomnia for which she must be compensated.

**WHEREFORE,** as Ms. Lindauer has verified facts sufficient to establish serious injuries against her by Ocwen, which in doing the acts herein stated, this Defendant acted with oppression, fraud, and malice, it is respectfully requested that this Honorable Court grant the following relief:

a) vacate the order granting foreclosure in the State of Maryland and restrain Ocwen Loan Servicing, LLC from participating in or supporting any future foreclosure action, striking all of its reference and information materials in that state court action.

b) award general damages of $200,000 for expenses incurred from the inception of Ocwen's foreclosure action to date, including credit for the stolen or misappropriated payments.

c) award consequential and compensatory damages in the amount of $300,000 for the unmitigated deceit and malicious, idle and vexatious "litigation maintenance" ("barratry").

d) award punitive damages in the amount of $5,000,000 (five million dollars).

e) award costs of this suit incurred herein and award such other and further relief as the court may deem just and proper.

Date: January 3, 2019

Respectfully submitted,

Susan Lindauer, *pro se*
232 Manor Circle
Takoma Park, Md. 20912
301-270-2413