

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 JAN -4  PM 2: 12

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Susan Lindauer          :
232 Manor Circle       :
Takoma Park, Maryland 20912    :     COMPLAINT
                                  :
    Plaintiff,                :
                                  :
    v.                       :
                                  :     Civil No.: PWG 19 CV0039
Ocwen Loan Servicing, LLC     :
1661 Worthington Road, Suite 100 :
West Palm Beach, FL 33409     :     **TRIAL BY JURY DEMANDED**
                                  :
    Defendant.             :

---

*Amended* **COMPLAINT** *with Exhibit "I"*
*— Bank Proofs*

**COMES NOW,** Susan Lindauer, Plaintiff in the above-captioned

matter, and files this complaint demanding judgment against Ocwen Loan

Servicing, LLC, (hereinafter, "Ocwen") and alleges the following in support

thereof:

1.      After a nationwide investigation by State financial regulators, State Attorney Generals, and the Consumer Financial Protection Bureau (hereinafter, "CFPB" a federal agency) , substantial evidence was uncovered that proved Ocwen violated multiple state laws and the Dodd-Frank Act, in the [mal]servicing of homeowners' mortgage loans and the unlawful pursuit of foreclosures.

2.      As a result, Ocwen voluntarily entered into a "Consent Judgment" on December 16, 2013, which was signed on behalf of Ocwen Financial Corporation and Ocwen Loan Servicing, LLC by Timothy M. Hayes, Executive Vice-President and General Counsel. This document was filed with the court on February 26, 2014. See Exhibit "A" attached.

3.      The fraudulent conduct by Ocwen alleged in this complaint occurred while the Consent Judgment was in force, beginning on or around February 26, 2014 and continues to this day.

4.      In February, 2001, Ms. Lindauer ("the Plaintiff") purchased certain real property commonly known as 232 Manor Circle, Takoma Park, Maryland 20912, hereinafter known as the "Subject Property."

5.      On or about February 20, 2007, Ms. Lindauer refinanced the "mortgage loan" on the Subject Property through American Heritage Lending Corporation (hereinafter "AHLC").

6.      At this time, she executed an adjustable rate balloon note (promissory note) in favor of AHLC, making a non-negotiable bond for payment of thirty years of monthly installments. See Exhibit "B" attached.

7.      The note was secured with a deed of trust impossibly naming Mortgage Electronic Registration Systems ("MERS") as "beneficiary", acting solely as an indenture nominee for AHLC and any successors and assigns; and who therefore was not any sort of 'beneficiary'. See Exhibit "C" attached.

8.      Ms. Lindauer immediately began to submit each monthly payment due on the mortgage loan to Chase Home Finance (hereinafter, "Chase"), which may have acquired the servicing rights to the mortgage loan from AHLC, who made those payments accordingly.

9.      In December, 2011, Ms. Lindauer received written notification from CHASE that her mortgage loan would soon be transferred to a different mortgage loan servicing company. CHASE declared that loans could not be transferred if they were past due.

10.     On February 6, 2012, bank records show Ms. Lindauer submitted and completed her regular monthly payment for February to CHASE.

11.     On March 6, 2012, bank records show Ms. Lindauer submitted and completed her regular monthly payment for March to CHASE.

12.     On April 2, 2012, bank records show Ms. Lindauer submitted and completed her regular monthly payment for April to CHASE.

13.     Property tax records for Montgomery County, Maryland show Ms. Lindauer had a tax credit of $234.86, following payment of her FY 2011 taxes, which could not possibly have accrued if Plaintiff was three or four months behind on the mortgage payments.

14.     On or about April 7, 2012, Ocwen Loan Servicing, (hereafter "Ocwen") may have acquired from CHASE the servicing rights to the mortgage loan from AHLC, and began to collect payments and sent later accountings by mail in that role. In good faith, Ms. Lindauer began to submit payments to Ocwen.

15.     On April 10, 2012, Ms. Lindauer received a phone solicitation from an Ocwen customer service representative who offered her, as a new customer, a one-time reduced payment that could cover any missing past payments or count as the next month's payment.

16.     Since Ms. Lindauer had already made her April payment, she was adamant that Ocwen's offer of a one-time reduced payment be credited forward to May, and the Ocwen representative assured her that would be the case. She was instructed to submit a non-refundable

U.S. Postal Money Order to Ocwen, received by mail on April 13, 2012.

17.     Ms. Lindauer's first complete payment to Ocwen was May 1, 2012, and she was assured by an Ocwen customer service representative that the May 1 payment would apply forward to June, in recognition of the one-time reduced payment received on April 13, once Ocwen sorted out all the new accounts it had recently acquired.

18.     Subsequently,  Ocwen credited Ms. Lindauer's May 1, 2012 payment to April 30, despite her bank statement proving the payment was made on May 1. To her dismay, the April 13 payment was disregarded as "incomplete," and not counted at all. When Ms. Lindauer pointed out the errors, Ocwen refused to correct the mortgage record.

19.     Ms. Lindauer was not yet aware of Ocwen's proclivities. Ocwen's Customer Service Agents had promised her payments on April  13 and May 1 would apply forward as a buffer for the future, which she considered most welcome.

20.     Upon calling Ocwen to tender her July payment, Ms. Lindauer was informed by the Ocwen representative that her payments to Ocwen in April and May would not apply forward, as promised by customer service representatives.  In other words, it had been a false solicitation.  Now Ocwen representatives demanded two payments for June and July, 2012, and refused to accept a single payment with another to follow a week or so later.  The unexpected demand for two payments flummoxed Ms. Lindauer's budget, and the payments were returned for insufficient funds, which she rectified before the end of July, 2012.

21.     Upon completing the double payments on or about July 29, 2012, Ms. Lindauer believed she was now up to date for June and July. She was amazed to learn Ocwen was still not satisfied. Ocwen declared the account was owed back to February; in other words, Ocwen said it had no record of Ms. Lindauer's  payments on February 6,  March 6, and April 2 to CHASE Bank, the prior mortgage loan servicer.  Moreover, Ocwen refused to acknowledge the one-time

reduced payment on April 13 as a complete and full payment, and continued to wrongly credit the May 1 payment to April 30, thus requiring an additional payment for May.

22.    From this point forward, Ocwen would credit all of Ms Lindauer's payments backwards several months for which she had already paid, and would apply multiple payments to the same months, despite her sending bank statements to Ocwen numerous times proving she had made all her payments and was not in arrears. Her record of  on-time payments was supported by TWO letters of Verification from Bank of America ("BOA") where she maintained a checking account, but Ocwen still refused to acknowledge Ms. Lindauer's on-time payments.  Ocwen reported to the credit bureaus that she was consistently 90 days + overdue, thus blocking her urgent efforts to refinance the mortgage and remove herself from Ocwen's oversight.  See Exhibit "I"-- bank proofs.

23.    Ocwen stopped taking Ms. Lindauer's payments in October, 2013. At that point she sought help from the Maryland Housing

Initiative Program (hereafter Maryland HIP), which quickly validated her payments and sought to liaison with Ocwen to straighten out the problem. While this effort was ongoing, Ms. Lindauer continued making payments through December, 2013, which Ocwen returned.

24.     With support from Maryland HIP, Ms. Lindauer was able to get a refinancing offer from Quicken Loans, contingent on Ocwen's acceptance of the on-time payments for February 6, March 6, April 2 and May 1, 2012. Quicken Loans agreed to pay any current month plus one additional payment, and Ms. Lindauer would be capable of submitting all other payments.

25.     Despite the best efforts of Maryland HIP and BOA to resolve the dispute, Ocwen continued to refuse to correct mistakes in its escrow records. In January, 2014, Ms. Lindauer's branch manager to Bank of America sat her down and refused to wire any more payments to Ocwen.  He told her "these people are crooks. They know you made your payments. This is foreclosure fraud." The branch manager urged Ms. Lindauer to get ready to show her proofs

of payments to the Maryland Courts.  Nobody at BOA believed Ms. Lindauer could possibly lose her home once these proofs of payments were shown to the Court.

26.     For another two years, Ocwen continued to ignore independent, third party validation of Ms. Lindauer's payments. Instead, Ocwen initiated foreclosure proceedings against the Subject Property on or about November 30, 2015 by filing a Notice of Foreclosure Action in the name of Laura H.G. O'Sullivan, et al, Substitute Trustees, naming the plaintiff as principal Respondent or Defendant in the State court action. See Exhibit "E" attached for the notice of foreclosure.

27.     All substitute trustees were attorneys employed by the foreclosure mill law firm of McCabe, Weisberg & Conway, LLC, 312 Marshall Avenue, Ste. 800, Laurel, Maryland 20707, standing instead of U.S. Bank, N.A. as Trustee for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates, Series 2007-2.

28.     This sudden appearance of U.S. Bank, N.A. as Trustee for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates, Series 2007-2 was a complete surprise, because this Plaintiff had never once heard of, nor dealt with such an entity.

29.     U.S. Bank, by its own publication, "Role of the Corporate Trustee, (attached as Exhibit "F") completely denies the premise altogether. Specifically, it is stated therein that the "Certificate Trustee" plays no role in foreclosures, loan modifications, holding notes, maintaining property, etc, and in the instant matter, U.S Bank displayed none of the attributes of a real creditor or real interested party.

30.     This style, a "Loan Certificate Trustee" relates to the well-known formula for a mortgage securitization trust, which is not a "trust" in the ordinary sense, but a Wall Street traded investment vehicle that benefits from a UCC-1 security agreement held by its "Certificate Series Trustee," against whomever it is that will actually hold the "mortgage loan enforcement rights."

31.      This debtor (the servicer) to the 5th party creditor ("the Certificate Trustee") collects the related monthly payments, and distributes accordingly, becoming the investment returns for the "securitization trust," which then gets traded in stock shares on the various financial exchanges.

32.      Neither a "Mortgage Backed Certificate Series Trustee," nor its attending Certificate Series Trust, holds any loans, notes, bonds, mortgages or has any legal right to anything, except under a UCC-1 Security Agreement, holding the "Mortgage Servicer" (like Ocwen Loan Servicing, LLC) as debtor in the arrangement. See the "Role of the Trustee in Asset Backed Securities" published by the "American Bankers Association Committee" at Exhibit "G."

33.      All the "loan paperwork," accounts, supporting statements, "business records," agency and agents, signatures and literally every element of the State foreclosure action against the subject property consists of material and activity fraudulently generated by Ocwen Loan Servicing, LLC.

34.      Neither its "substitute trustees," nor U.S. Bank, as Trustee for BNC Mortgage Loan Trust 2007-2 Mortgage Pass-Through Certificates Series 2007-2" ever added to, participated in, signed anything, or otherwise appeared except in this "borrowed" name.

35.      Meanwhile, all paperwork included in the foreclosure action was produced, verified, accounted, signed and executed soly by employees of "Ocwen Loan Servicing, LLD" and the law-firm of the "substitute trustees."

36.      The State Court granted foreclosure on March 3, 2017, notwithstanding the impossible set of circumstances, lack of admissible evidence, and the plethora of self-serving robo-signed (2) documents prepared by Ocwen, and without a judicial hearing to review conflicting evidence presented by Ms. Lindauer, or a judicial order in support of omitting her bank proofs and payment history.

37.      Of primary importance, therefore, the facts of the foreclosure have never been reviewed or decided on the merits. This filing is the

first chance Plaintiff Susan Lindauer has found to address the real issues in court, and the merits of her challenge to the foreclosure itself.

38.     The Sheriff's Sale of Ms. Lindauer's home of 20 years has now been scheduled for February 13, 2019, and the irreparable harm of Ms. Lindauer losing her property is real. Ocwen Loan Servicing, LLC has perpetrated a tremendous and deliberate fraud on the homeowner, Ms. Lindauer, the courts, and the State of Maryland.

39.     By deliberately refusing to account for proven payments, and willfully engineering a situation that makes foreclosure inevitable, Ocwen again proved its *modus operandi* as under the "Consent Judgment" executed by the Attorney Generals of all 50 States in February, 2014.

40.     This is a serious violation of that stipulation. Because of this longstanding pattern of fraudulent foreclosure activity, Ocwen Loan Servicing LLC was subject to a new lawsuit by the State of Maryland in July, 2017, citing violations of the 2014 Consent Agreement that derived from many of the same practices and policy circumstances

and environment cited in Ms. Lindauer's challenge to the foreclosure action.

41.     It is more than a reasonable inference that Ms. Lindauer has suffered all the same injuries as the other victims in the well-known "Ocwen Foreclosure Scam."

42.     In July, 2017, Maryland Attorney General Frosh went so far as to issue a "Cease and Desist" Order against Ocwen, forbidding Ocwen from acquiring any new mortgages in the State of Maryland until such practices were cured.   In February, 2018, Ocwen agreed to a Consent Judgment with the State of Maryland that lifted the Cease and Desist Order as of April 30, 2018, on the promise that such practices cited in the 2014 agreement would be eradicated.

43.     Ms. Lindauer stands before the Court today to declare that Ocwen's fraudulent foreclosure practices have not stopped since April 30, 2018, as required to resume mortgage servicing in the State of Maryland. They continue unabated. Despite entreaties, Ocwen has continued to refuse to credit $16,754 in mortgage payments and

property taxes to the mortgage escrow (See exhibit D for Proof of Payments). Instead, they have renewed attempts to steal her home of 20 years through this foreclosure instigated by fraud.

44.       As of September, 2018, Ms. Lindauer notified the Maryland Attorney General's Consumer Protection Office of Ocwen's persistent violations of the February, 2018 agreement that Ocwen must obey the 2014 Consent Agreement.  Rebuffing efforts by the Maryland AG's office to mediate a solution, Ocwen renewed its foreclosure actions against Ms. Lindauer, and has now scheduled an auction on February 13, 2019.

## FIRST ACCOUNT FOR DAMAGES

45.       Plaintiff incorporates all of the previous paragraphs as if set forth fully herein and at length.

46.       Ocwen engaged in a pattern and practice of defrauding the Plaintiff, during the time it was servicing Plaintiff Susan Lindauer's mortgage loan, where Ocwen willfully failed to credit  the payments proven to have been made.

47.     Ocwen engaged in a pattern and practice of defrauding the Plaintiff, during the time it was servicing Plaintiff's mortgage loan, when it "remote foreclosed" on the Subject Property without cause or standing, using a false name in an impossible capacity and to conceal its criminal wrongdoing.

48.     Defendant Ocwen Loan Servicing, LLC collectively and its agents or employees in their individual capacities, knew or should have known this was false, bringing the matter in obvious bad faith for the real purpose of stealing Ms. Lindauer's house, again deceiving the courts, the public and the homeowner by using a false name, not a party to any action or "mortgage loan."

49.     Ocwen covered its wrongdoing by supplying the court with fraudulent "records" and other documents and information, besides agency and signatures, on behalf of "U.S. Bank as Trustee", without any authority from U.S. Bank or an executive commission.

50.     It is denied that U.S. Bank authorized or participated in this matter at all, and Ocwen is charged with perjury and fraud in this

indictment.  U.S. Bank's own publication, "Role of the Corporate Trustee" (see again, Exhibit "F") completely denies the premise altogether.

51.      Based upon its fraudulent demand for non-payment, Ocwen filed a notice of foreclosure action against the Lindauer property, and to facilitate its fraudulent foreclosure action against these "Subject Premises," Ocwen ordered and supervised the fabrication of the fraudulent robo-signed documents used by the foreclosing Substitute Trustees in the foreclosure action against Plaintiff.

52.      Ms. Lindauer had no choice but to rely on the demonstrably fraudulent documents and defend her property. Had Ms. Lindauer ignored thee fraudulent documents, she would have lost her home much sooner, which is now scheduled for a Sheriff's sale on February 13, 2019.

53.      Several Ocwen employees were employed to perpetrate the fraud against Ms. Lindauer, including but not limited to Lori Ann Dasch, Andrew Smith, Mei-Ling Mitchell, and notary Brandi Berns,

who signed under oath documents they knew or should have known were fraudulent.

54.     Pursuant to the legal doctrine *nemo dat quod non habet*, or in plain English, you can't give what you don't have, the Substitute Trustees could not have any authority to foreclose on Ms. Lindauer's property because U.S. Bank, N.A. as Certificate Series Trustee had no authority to foreclose, and therefore no authority to assign.

55.     U.S Bank N.A. as Certificate Series Trustee did not and could not hold the promissory note, or the right to enforce payment, and it could not have by any other means either.

56.     This is clearly demonstrated on page 2 of a four-page document (see again, Exhibit "F") published by U.S. Bank entitled "Role of the Corporate Trustee" under the heading, "Who Initiates and Manages a Foreclosure?" whereby it states,

> "The trustee does not have an economic or beneficial interest in the loans and has no authority to manage or otherwise take action on the loans which is reserved for the servicer."

57.      Further, in that same paragraph,

> *"As noted, the trustee does not play a role in initiating or managing*
>
> *a foreclosure process and consequently has little, if any, information*
>
> *relating to mortgage loan activities including a foreclosure."*

58.      Ocwen was the purported servicer for Ms. Lindauer's mortgage loan, especially insofar as the state court "mortgage foreclosure was prosecuted and obtained.

59.      Further, in its conduct and evasions, Ocwen was in direct violation of a Consent Judgment in the United States District Court for the District of Columbia, 13-cv-2025 (See again, Exhibit "A")

60.      Ocwen voluntarily entered into the "Consent Judgment" on December 16, 2013 and it was signed on behalf of Ocwen Loan Servicing, LLC by Timothy M. Hayes, Executive Vice President and General Counsel.

61.      This was not the only settlement agreement Ocwen entered into: it also signed a Consent Order with the New York State Department of Financial Services, entered into by Ocwen dated

December 19, 2014 and again signed on behalf of ocwen Loan Servicing by Timothy M. Hayes, Executive Vice-President (see Exhibit "H" attached).

62.     The federal complaint that forced Ocwen to agree to the "Consent Judgment" with the Consumer Financial Protection Bureau (CFPB) and its forty-nine partner states and the District of Columbia, charged that Ocwen pushed borrowers into foreclosure by its own servicing errors, exactly like those it perpetrated upon Ms. Lindauer.

63.     Further, the CFPB and its partner states proved that Ocwen engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process.

64.     As demonstrated by the complaint filed in the federal district court in the District of Columbia, Ocwen's violations of consumer financial protections put thousands of people across the country at risk of losing their homes, including Ms. Lindauer, (see again Exhibit "A" "Consent Judgment")

65.     Specifically, the complaint charged that Ocwen took advantage of homeowners with servicing shortcuts and unauthorized fees in several ways, including: **failure to timely and accurately apply payments made by borrowers** [as in the case of Ms. Lindauer].

66.     **Failing to maintain accurate account statements** [as in the case of  Ms. Lindauer], **charging borrowers unauthorized fees** for default- related services [as in the case of Ms. Lindauer]; and providing **false or misleading information** in response to consumer complaints [as in the case of Ms. Lindauer].

67.     The complaint also charged that Ocwen was engaged in illegal foreclosure practices; one of the most important jobs of a mortgage servicer being management of the foreclosure process, but Ocwen mishandled foreclosures and provided consumers with false information designed to mislead and evade proper accounting.

68.     Noting that the "Role of the Corporate Trustee" (see again, Exhibit "F" establishes these relationships, and the distributed

workload, any foreclosure against Ms. Lindauer's property had to come from Ocwen and Ocwen only.

69.     Ocwen is maliciously motivated by the lucrative prospect of gaining the liquidation of the property and the huge industry attending foreclosure and litigation matters, besides government refunds.

70.     Specifically, Ocwen was proven to have:

a. Provided false and misleading information to consumers about the status of foreclosure proceedings where the borrower was in good faith actively pursuing a loss mitigation alternative also offered by Ocwen; and

b. Robo-signing foreclosure documents, including preparing, executing, notarizing, and filing affidavits in foreclosure proceedings with courts and government agencies without verifying the information.

71.     As part of its agreement, Ocwen agreed to stop robo-signing official documents; that it would ensure the facts asserted in its

documents about borrowers' loans used in foreclosure and bankruptcy proceedings were accurate and supported by reliable evidence, and its Affidavits and sworn statements would be averred on personal knowledge only.

72.     Since 2013, as amply shown by the facts of this instant case, Ocwen has failed to abide by the Consent Judgment it voluntarily signed in 2013, and we are now in 2019. Instead, Ocwen again and again breached the Consent Judgment; and the plaintiff has a direct and pecuniary interest in the guarantee.

73.     As direct and proximate result of the willful, malicious and wanton conduct of Ocwen as set forth above, and faced with the unlawful theft of her home, Ms. Lindauer suffered and continues to suffer from debilitating stress, anxiety, stress eating, mental anguish and uncertainty, physical infirmities and constant insomnia for which she must be compensated.

**WHEREFORE,** as Ms. Lindauer has verified facts sufficient to establish serious injuries against her by Ocwen, which in doing the acts

herein stated, this Defendant acted with oppression, fraud and malice, it is respectfully requested that this Honorable Court grant the following relief:

a) vacate the order granting foreclosure in the State of Maryland and restrain Ocwen Loan Servicing, LLC from participating in or supporting any future foreclosure action, striking all of its reference and information materials in that state court action.

b) award general damages of $200,000 for expenses incurred from the inception of Ocwen's foreclosure action to date, including credit for the stolen or misappropriated payments.

c) award consequential and compensatory damages in the amount of $300,000 for the unmitigated deceit and malicious, idle and vexatious "litigation maintenance" ("barratry").

d) award punitive damages in the amount of $5,000,000 (five million dollars).

e) award legal costs of this suit incurred herein and award such other and further relief as the court may deem just and proper.

Date: January 17, 2019

Respectfully submitted,

Susan Lindauer, *pro se* pending Counsel
232 Manor Circle
Takoma Park, MD 20912
301-270-2413